UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RICHARD CHARLES GENTRY,

  Plaintiff,

Case No. 1:19-cv-258

Hon. Robert J. Jonker

v.

CORIZON HEALTH, INC., *et al.*,

  Defendants.

_____/

### REPORT AND RECOMMENDATION

  This is a *pro se* civil rights action brought by a prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is now before the Court on a motion for summary judgment filed by defendants Corizon Health, Inc., Dr. Ravi D. Yarid, and NP Tammy J. Kelley (ECF No. 36).

  **I. Background**

  In his complaint, plaintiff alleged that on January 10, 2018, while incarcerated at the Lakeland Correctional Facility (LCF), he slipped on ice and injured his back, neck and shoulders. Compl (ECF No. 1, PageID.6). Plaintiff makes no allegation about his medical treatment or visits to healthcare between the dates of January 11, 2018, and March 13, 2018. *Id.*[1] In this action, plaintiff alleged that he saw defendant Dr. Yarid once, on March 14, 2018. *Id.* At

---

[1] While plaintiff visited healthcare after the incident, he did not pursue treatment. See, e.g., Clinical Progress Note (Jan. 29, 2018) (some type of dispute occurred at healthcare because plaintiff did not provide a prisoner injury report. While a medical evaluation was offered, "inmate was too upset to hear any of the explanation [sic] given to him and so he was ordered to leave.") PageID.255; Nurse Visit (Feb. 7, 2018) ("Prisoner verbalized [sic] filled out accident report three weeks ago. Health care did not get it; now better. Do not need to be seen.") PageID.258; and, Plaintiff's Kite (Feb. 7, 2018) ("please cancel any and every scheduled appointment, in response to any previous kite written before this date 02/07/18 and please recommend an expeditied [sic] system to respond to an urgent medical kite officer Clayman say he was contected [sic] too little too late.") PageID.259.

1

that time, Dr. Yarid performed what plaintiff believed was an "unorthodox treatment on my back." *Id.*[2] Plaintiff claims that "[t]wo months, or so, after that experience, my right foot became numb/sleep/tingling continuously." *Id*. Plaintiff alleged that he "was continuously denied treatment and/or instruction to alleviate my injuries and pains." *Id*.

On July 5, 2018, plaintiff saw NP Kelley, his new primary care provider. PageID.7.[3] After plaintiff "enlightened her" about his condition, NP Kelley said she did order x-rays and an EMG. *Id*. Plaintiff alleged that NP Kelley would not discuss his condition or test results from that time until his last encounter with her on September 25, 2018. *Id*. Plaintiff alleged that he saw non-party NP Groff on October 23, 2018. *Id*. NP Groff told plaintiff that she would be the new primary care provider. *Id.*[4] Groff knew nothing of his test results and told him that "there's no mention of a treatment plan." *Id*. At some point in time, Groff suggested physical therapy, and plaintiff alleged that it had been rejected pending the results of an MRI done on December 10, 2018. PageID.8. Plaintiff did not elaborate on who ordered the MRI. *Id*. Plaintiff saw a physical therapist on January 16, 2019, who told plaintiff that he could not do anything about the injuries, but offered and demonstrated exercises that might help the pain. *Id*. On February 10, 2019, NP Groff called plaintiff about an unrelated manner. *Id*. Groff acknowledged that a request for surgery was never made, but that she would be sending out a request to the Regional Medical Director for a surgery consultation. *Id*. Plaintiff stated that he was still awaiting instructions and treatment when he signed the complaint (March 26, 2019). *Id*. Plaintiff does not set forth any particular allegations against Corizon Health, Inc. (Corizon).

---

[2] In his affidavit, Dr. Yarid stated that he used osteopathic techniques to relieve plaintiff's pain in three areas: lumbar, thoracic, and pelvis. Dr. Yarid Aff. (ECF No. 36-3).
[3] Dr. Yarid transferred to the MDOC's Parnall Correctional Facility on July 1, 2018. Dr. Yarid Aff.
[4] NP Kelley transferred to the MDOC's Cooper Street Correctional Facility on November 4, 2018. NP Kelley Aff. (ECF No. 36-4).

On initial screening, the Court dismissed defendant State of Michigan. *See* Order (ECF No. 10). The Court construed plaintiff's claim as alleging deliberate indifference to a serious medical need in violation of the Eighth Amendment and ordered service of the complaint on defendants Corizon, Dr. Yarid, and NP Kelley. *See* Opinion (ECF No. 9); Order (ECF No. 10). Defendants have moved for summary judgment.

## II. Defendants' motion for summary judgment

### A. Legal standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the Court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### B.     Lack of Exhaustion

#### 1.     Exhaustion requirement

Defendants contend that plaintiff failed to exhaust his claims against Dr. Yarid and Corizon. The PLRA provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must first exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. One reason for creating prisoner grievance procedures under the PLRA was to create an administrative record for the court.

> Requiring exhaustion allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court. This has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record.

*Jones v. Bock*, 549 U.S. 199, 204 (2007). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Id.* at 218; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006).

4

"Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.

### 2. MDOC Grievance process

The MDOC requires prisoners to follow a three-step process to exhaust grievances. *See* Policy Directive 03.02.130 (effective July 9, 2007).[5] A prisoner must first attempt to resolve a problem with the staff member within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If the issue is not resolved, then the grievant may file a Step I grievance on the prescribed form within five business days after the grievant attempted to resolve the issue with appropriate staff. *Id.* at ¶¶ P and R. The Policy Directive provides the following directions for completing grievance forms:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

*Id.* at ¶ R (emphasis in original). The prisoner must send the Step I grievance to the appropriate grievance coordinator. *Id.* at ¶ V. If the prisoner is dissatisfied with the Step I response, or does not receive a timely response, he must request the appropriate form and send it to the Step II Grievance Coordinator. *Id.* at ¶ BB. Finally, if a prisoner is dissatisfied with the Step II response, or does not receive a timely response, he must send a completed Step III grievance, using the appropriate form, to the Grievance and Appeals Section. *Id.* at ¶ FF.

### 3. Discussion

Defendants point out that plaintiff's grievance record does not contain any grievances against either Dr. Yard or Corizon. Plaintiff's only exhausted grievance is against

---

[5] The Court notes that the MDOC revised its grievance policy effective March 18, 2019. Plaintiff's grievances referenced in this report were filed in 2018 and fall under the policy which had been in effect since July 9, 2007.

defendant NP Kelley because she would not discuss his EMG and x-ray findings with plaintiff on either August 14, 2018 or September 25, 2018. *See* Grievance LCF 2018-09-0951-12D4 ("951") (dated September 25, 2018) (ECF No. 36-5, PageID.226-238); MDOC Prisoner Step III Grievance Report (ECF No. 36-5, PageID.224-225).

In his response brief, plaintiff provided copies of a Step I Grievance Response and a Step II Grievance Appeal Response for Grievance LCF 2018-01-0095-12E1 ("95") (ECF Nos. 42-6 and 42-7). Based on the Step II appeal response, plaintiff's grievance claimed that LCF Healthcare denied him medical attention after his slip and fall on January 10, 2018. There is no evidence that plaintiff exhausted this claim to Step III. Furthermore, this grievance is not relevant, because plaintiff's lawsuit does not involve a claim for lack of medical treatment prior to March 14, 2018. Based on this record, plaintiff failed to properly exhaust his claims against defendants Corizon and Dr. Yarid. *See Jones*, 549 U.S. at 218-19; *Woodford*, 548 U.S. at 90-93. Accordingly, defendants Corizon and Dr. Yarid are entitled to summary judgment.

### C.     Eighth Amendment claim

#### 1.     Legal standard

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law." *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992). The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Id.* at 8-9. "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

**2.     Discussion**

The gist of plaintiff's exhausted claim is that NP Kelley was deliberately indifferent to his serious medical needs for failing to advise him about the results of his EMG and x-rays on August 14, 2018 and September 25, 2018. *See* Grievance 95. The documents filed in the grievance process set forth a chronology of plaintiff's medical testing and treatment for his complaints. In the Step I supplemental response form (dated October 12, 2018), the respondent noted that plaintiff's EMG was performed offsite on August 22, 2018. PageID.230. Because the test had not yet occurred, there were no test results to discuss when plaintiff saw NP Kelley on August 14, 2018. The next scheduled visit was for a pre-scheduled medication assessment for a different matter on August 28, 2018. *Id*. However, the EMG results were not available at that time. *Id*. The findings were available and scheduled to be discussed with plaintiff on September 25, 2018. *Id*. However, the grievance response notes that "the grievant left healthcare refusing the visit." *Id*. Plaintiff did not dispute this timeline in his Step II Appeal, which he filed on October 27, 2018 (after NP Kelley left LCF). PageID.227. Rather, plaintiff stated that NP Kelley was negligent in following up on x-ray and EMG results, and that she should be disciplined due to her "unwillingness to discuss my injuries anytime after our first meet [sic]." *Id*. The Step II response dated November 14, 2018, notes that plaintiff asked about the x-ray results in a kite from September 2018, and was told he could address the x-ray results with the medical provider at the upcoming appointment (scheduled for September 25, 2018). *Id*. As discussed, plaintiff refused his medical visit on that date. *Id*. The Step II response also noted that "[d]ocumentation from 9/25/18 MP [medical provider] appointment reflects Grievance was agitated and refused visit today." *Id*. The response also advised plaintiff that he had been approved to have an MRI completed for his lower back pain and to watch for call outs for this appointment. *Id*.

The timelines and statements set forth in the Step I and Step II responses are supported by plaintiff's medical records. *See* Plaintiff's Medical Records (ECF No. 38). The records include the following. NP Kelley ordered lumbar x-rays, a bottom bunk detail, and an EMG on July 6, 2018. PageID.274-280. NP Kelley also ordered ice for plaintiff's low back x 5 days on July 13, 2018. PageID.282-284. However, plaintiff was a "no show" for the ice on July 16, 2018. PageID.285. Lumbar spine x-rays were taken off-site on July 16, 2018. PageID.286. Plaintiff refused ice on July 19, 2018, PageID.287. Plaintiff had an off-site EMG on August 22, 2018. PageID.288. After his EMG, during a scheduled nurse visit on September 6, 2018, plaintiff "[r]efused to be seen in clinic to discuss options for back pain." PageID.293. Plaintiff requested to speak with medical provider about x-ray and other testing, and was referred "to provider on upcoming appt." *Id*. The medical provider reviewed the EMG results on September 20, 2018. PageID.297. NP Kelley noted that plaintiff was "agitated and refused visit" on September 25, 2018. PageID.298.

NP Kelley addressed plaintiff's claims in her affidavit, stating in pertinent part:

> 3. On July 6, 2018, Mr. Gentry presented for a scheduled provider visit. Mr. Gentry reported he had pain with ambulating distances and relief with lying down. He complained of pain and numbness in his right lower extremity for the past two months. Mr. Gentry also reported numbness in his right foot.
>
> 4. I noted Mr. Gentry had decreased lumbar mobility, his spine was positive for posterior tenderness, and he did not have paravertebral spasms. I submitted a consultation request ("407") for an electromyography ("EMG") of his bilateral lower extremities.
>
> 5. I also ordered lumbar x-rays, instructed he take his prescriptions as ordered, and to increase his activity level. During this visit I also extended his detail for a bottom bunk, and informed Mr. Gentry to notify healthcare if his condition worsened or if he failed to improve.
>
> 6. I also discussed the UptoDate treatment for lower back pain and provided him with exercises.

9

>  7. On July 9, 2019 [sic], Keith Papendick, M.D. approved my request for an EMG.
>
>  8. On July 13, 2018, Mr. Gentry presented for a scheduled provider visit. I ordered the nursing staff to provide Mr. Gentry with ice to his lower back twice per day for five days.
>
>  9. On September 20, 2018, I reviewed the EMG results, which revealed an abnormal study with evidence of acute L4-L5 and L5-S1 radiculopathy bilaterally along with sensory motor polyneuropathy.
>
>  10. On September 25, 2018, Mr. Gentry presented to discuss his x-ray and EMG results. During this visit, Mr. Gentry was agitated and refused his appointment.
>
>  11. This was my last interaction or involvement with Mr. Gentry's medical care.

Kelley Aff. (ECF No. 36-4, PageID.222).

Although the incident report for January10, 2018 is not part of this litigation, plaintiff's response addressed it, stating that he did not receive it until May 9, 2018, and that it was "fraudulent." Plaintiff's Response (ECF No. 42, PageID.333). Based on his response, part of his dispute with the healthcare department involved a $5.00 co-pay for health care, and the significance of the incident report was to avoid paying the co-pay for visits related to his injuries. *Id*. With respect to the claims against NP Kelley, plaintiff states that the September 25, 2018 meeting began with his "Hep, C follow up", which plaintiff interrupted to inquire about his injuries and test results. PageID.334. NP Kelley replied, "We're not discussing that today", at which point plaintiff "announced that was all I was going to discuss." *Id*. According to plaintiff, the conversation became "verbally, confrontational, and got, quite loud," which caused an officer to approach NP Kelley's office. *Id*. NP Kelley printed out a document, asked plaintiff to sign it, plaintiff refused, and eventually the Officer "yelled" at plaintiff "Get outta here." *Id*. Plaintiff left and filed a grievance. *Id*.

Plaintiff did not set forth any facts in an affidavit to dispute the accuracy of his medical records or NP Kelley's affidavit. Rather, plaintiff prefaced his "statement of facts" in his

10

response by stating "[t]he 'facts' that I have stated in my original complaint, I declare to be true to the best of my knowledge, information and belief." PageID.333. Plaintiff's statement of facts are not sufficient to create a genuine issue of material fact: he did not file a verified complaint; the declaration contained in his response did not create a factual basis to oppose the motion for summary judgment because it did not comply with 28 U.S.C. § 1746;[6] and, his statements could not create a genuine issue of material fact because thy are based upon "information and belief." [7]

Even if plaintiff had placed his claims in an appropriate declaration, his version of events does not meet the subjective prong of a deliberate indifference claim.

As an initial matter, plaintiff's disagreement with the way in which NP Kelley addressed, or failed to address, his test results did not give rise to an Eighth Amendment claim. As noted, *supra*, the EMG was not completed when plaintiff met with NP Kelley on August 14th. While NP Kelley was prepared to discuss the EMG results during the chronic care visit for hepatitis on September 25th, plaintiff "announced" that he was only going to talk about his test results and engaged in a verbal confrontation with Kelley which resulted in his removal from the healthcare office. As one court observed, when a plaintiff "does not dispute that he has undergone tests, but rather that no one will tell him what is actually wrong with him," such a situation "is a case of a failure of effective communication between doctor and patient, not a case of deliberate indifference

---

[6] To qualify as an unsworn declaration under that statute, a statement must be made in substantially the following form "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)". 28 U.S.C. § 1746(2). Here, plaintiff's statements did not comply with the statute. He did not make a declaration under penalty of perjury and he did not verify that the statements were "true and correct."

[7] A party's statement made "to the best of my knowledge, information and belief" does not demonstrate personal knowledge and cannot create genuine issues of fact for purposes of a summary judgment motion. *Kiplinger v. Selene Finance, LP*, No. 1:15-cv-105, 2015 WL 9255564 at *3 (W.D. Mich. Dec. 18, 2015). *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (holding that the affiant's "statement . . . based upon his 'belief'. . . did not demonstrate the personal knowledge required by Fed. R. Civ. P. 56(e)"); *Pace v. Capobianco*, 283 F.3d 1275, 1278 (11th Cir. 2002) (the "personal knowledge requirement [of Rule 56] prevents statements in affidavits that are based, in part, 'upon information and belief' – instead of only knowledge – from raising genuine issues of fact sufficient to defeat summary judgment"); *Dellacava v. Painters Pension Fund of Westchester and Putnam Counties*, 851 F.2d 22, 27 (2d Cir. 1988) (statements in an affidavit made "upon information and belief" have "no probative value and may not be considered in a motion for summary judgment").

11

to serious medical needs." *Ramey v. Collins*, No. 1:07CV740, 2009 WL 614960 at *4 (S.D. Ohio March 6, 2009).

Next, there is no evidence that NP Kelley ignored plaintiff's medical condition or exhibited "obduracy and wantonness" in treating him in July, August, and September 2018. It is undisputed that she ordered x-rays, an EMG, a lower bunk accommodation, and ice for plaintiff's lower back. It appears that another medical provider continued the medical evaluation process by ordering an MRI. "[W]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in state tort law." *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 385 (6th Cir. 2004) (internal quotation marks omitted). Plaintiff's disagreement with his physicians over the proper course of treatment "alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983." *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017). "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.

Finally, plaintiff cannot claim that medical providers were deliberately indifferent to his serious medical needs when he refused to attend healthcare appointments, refused to accept treatments, and disrupted medical visits with confrontational behavior.

> A voluntary refusal of treatment precludes an Eighth Amendment claim. *Palmer v. Wagner,* 3 Fed. App'x 329, 331 (6th Cir. 2001). Prison officials are not deliberately indifferent to a prisoner's serious medical needs when the prisoner refuses to accept medical treatment. *See, e.g., Richard v. Bokor*, 379 Fed. Appx. 719, 720–22 (10th Cir. 2010) (prisoner failed to state a claim for deliberate indifference where he thwarted medical personnel's efforts by disrupting the medical visits and refusing the offered treatment)[.]

*Johnson v. Allen*, No. 1:15-cv-1329, 2016 WL 860428 at *4 (W.D. Mich. March 7, 2016).

For all of these reasons, defendant NP Kelley's motion for summary judgment should be granted.

### IV. Recommendation

Accordingly, I respectfully recommend that defendants' motion for summary judgment (ECF No. 36) be **GRANTED** and that this case be **TERMINATED**.

Dated:  June 4, 2020                             /s/ Ray Kent
                                                 United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).